## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **CHEMMASTERS, INC.**<br>300 Edwards Street<br>Madison OH 44057,<br><br>       Plaintiff,<br><br>vs.<br><br>**MIGDAHL, INC.**<br>7240 State Road<br>Philadelphia PA 19135,<br><br>-and-<br><br>**DARRYL F. MANUEL**<br>706 Knox Court<br>Morrisville, PA 19067,<br><br>       Defendants. | CASE NO. _____<br><br>JUDGE _____<br><br><br>**PLAINTIFF'S COMPLAINT**<br><br><br>**[JURY DEMAND ENDORSED HEREON]** |

For its Complaint against Defendants Migdahl, Inc. ("Migdahl") and Darryl F. Manuel ("Manuel") (together, "Defendants"), Plaintiff ChemMasters, Inc. ("ChemMasters") alleges the following:

### NATURE OF THE SUIT

This action is brought by ChemMasters against Defendants in connection with ChemMasters' purchase of Migdahl's assets in or about July 2020 (the "Transaction"). During negotiations and prior to Closing (defined below), Migdahl and Manuel (Migdahl's President) misrepresented and fraudulently concealed material facts about Migdahl's business and products – specifically, the number of reactor hours required to manufacture (or "polymerize") certain

resins included in the Purchased Assets (defined below), which directly correlates to costs of production and to the corresponding value of the Purchased Assets. Defendants' fraud, misrepresentations, and omissions harmed ChemMasters by inducing it to purchase Migdahl's assets and at an artificially inflated price.

ChemMasters seeks compensatory and punitive damages against Defendants for their fraud, misrepresentations, and breaches of contract, as well as an award of ChemMasters' reasonable attorney fees and litigation costs and expenses incurred herein.

## THE PARTIES

1.      ChemMasters is an Ohio corporation with its principal place of business in Madison, Ohio.

2.      Migdahl is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

3.      Manuel is an individual and resides in Morrisville, Pennsylvania.

## JURISDICTION & VENUE

4.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the matter in controversy is between citizens of different States and exceeds the sum of $75,000, exclusive of interest and costs.

5.      Venue is proper in this Court, and this Court has jurisdiction over Defendants, because the parties' written agreement contains a valid and enforceable forum selection clause, pursuant to which Defendants consented to the jurisdiction and venue of the courts in this judicial district; and, in addition, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the action took place in this judicial district.

## GENERAL ALLEGATIONS

6.      ChemMasters is a specialized manufacturer of concrete coatings and chemicals used for the improvement, repair, and protection of concrete and masonry in highway, commercial, and residential construction.

7.      Prior to the Transaction, Migdahl was named "Poly Sat Inc." and used "Vexcon" and "Vexcon Chemicals" as trade or fictitious names, and its business was manufacturing and selling construction chemical products (including resins) designed primarily for the construction, replacement, enhancement, protection, and maintenance of concrete and masonry structures (the "Products").

8.      Manuel is, and at all relevant times was, the owner and President of Migdahl.

9.      On or about June 26, 2020, ChemMasters and Migdahl entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"), pursuant to which ChemMasters purchased all of Migdahl's assets except for those assets the expressly excluded assets (the "Purchased Assets") for the negotiated and agreed-upon purchase price set forth in the Agreement.

10.     By definition, Migdahl was the "Seller" and ChemMasters was the "Purchaser" under the Asset Purchase Agreement.

11.     The Purchased Assets include Migdahl's inventories of its Products – including several resins that are integrated into concrete sealers and coatings (the "Resins") – as well as Migdahl's Product formulas, production methods, production data, marks, and trade names.

12.     As a condition to Closing on the Transaction, Manuel executed a Shareholder Guaranty, pursuant to which he absolutely, irrevocably, and unconditionally guaranteed full and prompt performance of Migdahl's obligations and payment of Migdahl's liabilities under the

Asset Purchase Agreement, including all liabilities arising out of Migdahl's breaches thereof and misrepresentations therein or in connection therewith (the "Guaranty").

13.     As a further condition to Closing, Migdahl and ChemMasters entered into a manufacturing agreement (the "Toll Manufacturing Agreement"), pursuant to which Migdahl – for ninety (90) days post-Closing – would manufacture the Resins for ChemMasters at Migdahl's facility; thereafter, the Resins would be produced for ChemMasters by a third-party manufacturer introduced to ChemMasters by Defendants, Toll Solutions LLC ("Toll Solutions").

14.     The Asset Purchase Agreement, the Guaranty, the Toll Manufacturing Agreement, and the other instruments, agreements, and documents required therein are referred to collectively in this Complaint as the "Purchase Documents."

15.     The Asset Purchase Agreement requires Migdahl to indemnify ChemMasters and hold ChemMasters harmless against all losses, damages, claims, actions, suits, demands, judgments, expenses (including legal fees and other fees and charges) incurred or sustained by ChemMasters as a result of or attributable to any misrepresentation or breach of any representation, warranty, covenant, or agreement given or made by Seller in the Asset Purchase Agreement or in any other documents delivered to ChemMasters in connection with the Transaction ("Indemnification").

16.     Pursuant to the Asset Purchase Agreement, 90% of the purchase price was paid to Migdahl at Closing, and the remaining 10% was held back in escrow during the Reconciliation Period, defined in the Asset Purchase Agreement as the period commencing at Closing and ending sixty (60) days after expiration of the term of the Toll Manufacturing Agreement (the "Holdback").

17.     The purpose of the Holdback was to provide security for Defendants' performance of their contractual obligations under the Purchase Documents and to satisfy, at least in part, any damages due ChemMasters from Defendants if they failed to do so.

18.     The Guaranty and the Toll Manufacturing Agreement also impose liability on Manuel and Migdahl, respectively, for ChemMasters' reasonable attorney fees, collection costs, and other expenses incurred by ChemMasters in any action or proceeding for enforcement of and/or arising out of any breach of the Purchase Documents.

19.     The Asset Purchase Agreement contains the following express Seller representations and warranties:

(a) All Seller financials and documents supplied to ChemMasters during the due diligence period (prior to Closing) are true, complete, accurate, and authentic;

(b) No Seller representations or warranties in the Asset Purchase Agreement contain an untrue statement of material fact, or omit a material fact either required to be stated therein or needed to be stated therein so that Seller's statements would not be materially false or misleading; and

(c) Seller has not failed to disclose to ChemMasters, in writing, any fact that materially adversely affects Seller's condition, its business, or the Purchased Assets.

20.     The Transaction closed on July 7, 2020 (the "Closing").

21.     Throughout the due diligence period and before Closing, Defendants – personally and through their authorized representatives – supplied to ChemMasters materially false information, both orally and in writing, about the number of hours in the reactor ("Reactor Time") required to produce the Resins and, because manufacturing charges are calculated based on reactor-time hours, the manufacturing charges that ChemMasters would have to pay for production of those Products when the Toll Manufacturing Agreement ended.

22.     Defendants knew that, when the Toll Manufacturing Agreement expired (and Migdahl would no longer be manufacturing the Resins for ChemMasters), production of the Resins would be out-sourced to Toll Solutions; and Defendants knew that Toll Solutions, like other suppliers in the industry, would charge ChemMasters based on the number of reactor-time hours required to manufacture those Products.

23.     In fact, Defendants were the parties that brought Toll Solutions to the Transaction; and, throughout the due diligence period, Defendants communicated with Toll Solutions directly, orally and in writing, about the Resin formulas, manufacturing procedures and reactor times and participated in many meetings and calls with Toll Solutions and with ChemMasters on those subjects (sometimes separately; sometimes all together). Defendants insisted on this protocol, and would not provide the formulas and manufacturing procedures to ChemMasters directly, because (at the time) Migdahl and ChemMasters were competitors.

24.     Defendants knew that Toll Solutions calculates its manufacturing charges based the number of reactor-time hours needed to polymerize a chemical product, and further that Toll Solutions' manufacturing charges to ChemMasters for the resins would be several hundreds of dollars per hour in the reactor

25.     The reactor times of the Resins are and were material to ChemMasters because its manufacturing charges (post-expiration of the Toll Manufacturing Agreement) would be calculated based on reactor-time hours. Consequently, longer reactor times directly correlate to greater production costs; and the greater the production costs, the less valuable the Purchased Assets.

26.    The reactor times required to polymerize (manufacture) the Resins was a significant factor in ChemMasters' valuation of the Purchased Assets, and a significant factor in the amount that ChemMasters was willing to pay for them.

27.    ChemMasters expressly told Defendants that the Resins' reactor times were a "critical variable" and central to the amount of the purchase price that ChemMasters would pay in the Transaction; and ChemMasters asked Defendants and their authorized representatives (more than once) to confirm their promises, representations and assurances about the Resins' reactor times before ChemMasters would agree to proceed to Closing.

28.    Defendants, therefore, knew and fully understood that the reactor times required to manufacture the Resins were material to ChemMasters.

29.     Defendants knew that the Resins' reactor times was material to ChemMasters and material to the Transaction because:

(a) ChemMasters specifically asked for and sought assurances from Defendants and their authorized representatives, more than once, about the Resins' reactor times and manufacturing costs;

(b) ChemMasters expressly conditioned Closing on Toll Solution's ability to successfully produce the Resins within the promised reactor times; and

(c) ChemMasters' valuation of the Purchased Assets, and the corresponding purchase price that ChemMasters agreed to pay for them, was contingent on manufacture of the Resins within the promised reactor times.

30.    Nevertheless, throughout the due diligence period and prior to Closing, Defendants repeatedly misrepresented and supplied materially false information to ChemMasters about the number of reactor-time hours required to manufacture the Resins, and repeatedly misrepresented and supplied false information to ChemMasters about the Resins' manufacturing costs – reporting reactor-time hours and corresponding price-per-pound charges of less than half the Resins' true reactor-time hours and price-per-pound manufacturing costs.

7

31.     During contract negotiations and the due diligence period, Defendants affirmatively misrepresented, concealed, and/or omitted material information about the Resins' reactor times, and they failed to correct or clarify false or misleading information about the reactor times that they supplied and caused to be supplied to ChemMasters. A non-exclusive list of specific examples of Defendants' fraudulent misrepresentations, concealments, and omissions includes the following:

(a) In about January 2020, Defendants (through their authorized representative, and based on information supplied by Manuel himself) supplied documents and information representing that ChemMasters' production costs for one of the Resins (after expiration of the Toll Manufacturing Agreement) would be the specified price-per-pound.[1]

(b) In or about January 2020, Manuel told ChemMasters' chief chemist (Paul Smith) that the reactor time needed to manufacture the Resin was the number of hours that equates to the price-per-pound cost represented by Defendants (through their authorized representative) in January 2020.

(c) In an email dated March 13, 2020, Defendants' authorized representative (Rich Strobel) confirmed to ChemMasters, in writing, express assurances that Manuel had supplied to ChemMasters during a phone call earlier that day that the "production process" takes the number of reactor-time hours that correlates to the price-per-pound cost represented by Defendants (through their authorized representative) in January 2020.

(d) In late April 2020, Manuel again represented to ChemMasters that ChemMasters' production costs for the Resin would be the price-per-pound cost represented by Defendants (through their authorized representative) in January 2020; and Defendants' authorized representative (Rich Strobel) once again confirmed those representations, in writing, in an email to ChemMasters sent later that day.

(e) On or about May 7, 2020, Manuel represented to ChemMasters' Chairman (P.J. Murphy) that the Resin's reactor time was the same number of hours represented by Defendants (through their authorized representative) in January 2020, which correlates to the represented price-per-pound cost.

---

[1] Due to the proprietary, commercially-sensitive, and highly confidential nature of the Resins' reactor hours and price-per-pound manufacturing charges, those amounts are not specified in this public filing; but it is available upon entry of a protective order that provides adequate safeguards and, upon request, for *in camera* review by the Court.

(f) In an email from Strobel to ChemMasters dated May 8, 2020 – carbon copied to Manuel – Strobel again confirmed, based specifically on information supplied by Manuel that ChemMasters' production costs for the Resin would be the previously represented price-per-pound that equates to the previously represented number of reactor-time hours. At no time did Manuel ever dispute, deny, negate, or in any way qualify Strobel's affirmative statements about the represented reactor time or corresponding production costs.

(g) In written disclosures supplied to ChemMasters on or about May 19, 2020, Strobel again represented that, based on information provided by Manuel, ChemMasters' manufacturing costs for the Resin would be the previously represented price-per-pound costs.

(h) On May 26, 2020, during an approximate 90 minute videotaped meeting attended by ChemMasters, Manuel, and Toll Solutions, ChemMasters reiterated that reactor time was a "critical variable" and, point blank, asked Defendants to confirm the number of reactor-time hours needed to manufacture the Resins. In Manuel's presence, Toll Solutions (which had been working directly with Manuel on the manufacture of the Resins) responded that, based on information supplied to them by Manuel, the reactor time would be the previously represented number of hours. Manuel, once again, did not dispute deny, correct, or qualify those statements in any way.

32.    ChemMasters relied on Defendants' promises, assurances, and representations about the Resins' reactor times and was induced by them to proceed to Closing on the Transaction.

33.    ChemMasters only learned the truth about the Resins' reactor times after the Toll Manufacturing Agreement ended and Toll Solutions was to start manufacturing the Resins for ChemMasters. That is when ChemMasters was informed, for the first time, that its manufacturing costs for the Resins would be substantially greater than the pricing as previously represented by Defendants, specifically because the Resins could not be manufactured in the number of reactor-time hours that Defendants and their authorized representatives had repeatedly promised, assured and represented to ChemMasters.

34.     ChemMasters would not have closed on the Transaction, and it would not have paid the negotiated purchase price for the Purchased Assets, if Defendants had not affirmatively misrepresented, fraudulently concealed and omitted material facts about the Resins' reactor times, but instead had provided truthful, accurate, and complete disclosures – as the Purchase Documents and Defendants' contractual obligations required.

## COUNT ONE
**Fraudulent Inducement**
**Against Defendants Migdahl and Manuel**

35.     ChemMasters incorporates into this Count by reference all averments set forth above as though fully re-written herein at length.

36.     Defendants were contractually obligated to make full and truthful disclosures to ChemMasters of all material information pertaining to Migdahl's business, the Products, and the Purchased Assets.

37.     During the due diligence period and prior to Closing, Defendants misrepresented and concealed one or more facts that were material to the Transaction; and they omitted and failed to disclose material facts that rendered information supplied to ChemMasters misleading, incomplete, and inaccurate.

38.     Defendants acted with knowledge of the falsity and misleading nature of their misrepresentations, concealments, and omissions, or they acted with such utter disregard and recklessness for the truth that their knowledge may be inferred.

39.     Defendants intended to mislead ChemMasters into relying upon their misrepresentations, concealments, and omissions of material fact.

40.     ChemMasters, to its detriment, justifiably relied upon Defendants' misrepresentations, concealments, and omissions of material fact.

10

41.     Defendants induced ChemMasters into Closing on the Transaction by misrepresenting the Resins' reactor times and by concealing, omitting and/or failing to disclose information that Defendants knew or reasonably should have known was material to ChemMasters and its decision to go forward with Closing on the Transaction.

42.     ChemMasters would not have closed on the Transaction and would not have paid the amount set forth in the Asset Purchase Agreement if Defendants had disclosed the truth about the Resins' reactor times.

43.     ChemMasters has been damaged by Defendants' fraud, in amounts that will be proven at trial.

44.     Defendants' fraudulent conduct was willful, intentional, egregious, reckless, malicious, and in bad faith.

### COUNT TWO
**Negligent Misrepresentation**
**Against Defendants Migdahl and Manuel**

45.     ChemMasters incorporates into this Count by reference all averments set forth above as though fully re-written herein at length.

46.     Defendants, in the course of their business and in connection with a transaction in which they had a pecuniary interest, supplied false information to ChemMasters for ChemMasters' guidance in its business transactions.

47.     Defendants failed to exercise reasonable care or competence in communicating information that was supplied to ChemMasters.

48.     ChemMasters justifiably relied on the information supplied by Defendants and suffered pecuniary loss as a result of its justifiable reliance.

49.     ChemMasters has been damaged by Defendants' negligence, in amounts that will be proven at trial.

**COUNT THREE**
**Breach of Asset Purchase Agreement**
**Against Defendant Migdahl**

50.     ChemMasters incorporates into this Count by reference all averments set forth above as though fully re-written herein at length.

51.      The Asset Purchase Agreement contractually obligated Migdahl to provide materially truthful, accurate, complete, and non-misleading information and disclosures to ChemMasters.

52.     Pursuant to the Asset Purchase Agreement, Migdahl represented and warranted that the information and disclosures to ChemMasters about Migdahl's business, its Products, and the Purchased Assets were truthful, accurate, complete, and non-misleading.

53.     Migdahl breached its contractual obligations to ChemMasters by misrepresenting, making false statements about, providing false or misleading information about, and/or omitting or failing to disclose material information about Migdahl's business, its Products, and the Purchased Assets, including but not limited to the truth about the Resins' reactor times.

54.     Migdahl further breached its contractual obligations to ChemMasters by failing to deliver all of the Purchased Assets, including production data relating to manufacture of the Resins.

55.     ChemMasters has been damaged by Migdahl's contractual breaches, in amounts that will be proven at trial.

12

56.     Pursuant to the Asset Purchase Agreement, Migdahl (as a consequence of its contractual breaches) is also liable to ChemMasters for ChemMasters' reasonable attorney fees, litigation expenses, and costs incurred herein.

**COUNT FOUR**
**Breach of Guaranty**
**Against Defendant Manuel**

57.     ChemMasters incorporates into this Count by reference all averments set forth above as though fully re-written herein at length.

58.     Pursuant to the Guaranty, Manuel unconditionally guaranteed Migdahl's performance of its contractual obligations under the Asset Purchase Agreement, including its disclosure, representation, and warranty obligations.

59.     Pursuant to the Guaranty, Manuel is liable to ChemMasters for damages caused by Migdahl's breaches, including but not limited to Migdahl's breaches of its contractual disclosure, representation, and warranty obligations.

60.     Pursuant to the Guaranty, Manuel is also liable to ChemMasters for ChemMasters' reasonable attorney fees, litigation expenses, and costs incurred herein.

**WHEREFORE**, ChemMasters respectfully requests that this Court enter judgment in its favor on its Complaint and grant ChemMasters the following relief:

(A) Against Defendants, jointly and severally, an award of compensatory damages for Defendants' fraud, misrepresentations, concealments, omissions, and breaches of contract in an amount that exceeds $75,000 (exclusive of interests and costs) that will be proven at trial;

(B) Against Defendants, jointly and severally, an award of punitive damages and ChemMasters' reasonable attorney fees and litigation expenses and costs for Defendants' willful, intentional, fraudulent, egregious, reckless, malicious, and bad faith conduct;

(C) Against Defendants, jointly and severally, for their breaches of the Purchase Documents, an award of ChemMasters' reasonable attorney fees, litigation expenses, and costs incurred herein;

(D) An Order directing Migdahl to authorize release of the full amount of the Holdback to ChemMasters, in partial satisfaction of Defendants' liability to ChemMasters;

(E) Pre-judgment and post-judgment interest; and

(F) Such other relief as this Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff ChemMasters, Inc. respectfully demands a jury on all issues so triable.

Respectfully submitted,

 */s/ Deborah J. Michelson*
DEBORAH J. MICHELSON (0059044)
michelson@buckleyking.com
DAVID A. KUNSELMAN (0073980)
kunselman@buckleyking.com
BUCKLEY KING LPA
1400 Fifth Third Center
600 Superior Avenue, East
Cleveland, OH  44114-2652
(216) 363-1400
(216) 579-1020 (*facsimile*)

Attorneys for Plaintiff
ChemMasters, Inc.